IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| ROB BOWLER and JANA BOWLER; | ) |
| Plaintiffs, | ) Civil No.  11-6037-HO |
| v. | ) |
| UNITED STATES BUREAU OF LAND MANAGEMENT; | ) ORDER |
| Defendants. | ) |

Introduction

Plaintiffs Rob Bowler and Jana Bowler (Bowlers) move for summary judgment seeking a declaration that the defendants United States Bureau of Land Management (BLM), and U.S. Department of the Interior (USDI) violated the Wild and Scenic Rivers Act (WSRA), the National Environmental Policy Act (NEPA), the Federal Land policy Management Act (FLPMA), and the Administrative Procedures Act (APA) by preparing and approving the Tioga Bridge and Susan Creek Day-Use

ORDER - p.1

area project[1] and by the Interior Board of Land Appeals' (IBLA) October 10, 2010, affirmation of the BLM's finding of no significant impact (FONSI) and decision document. [#18].

Plaintiffs have also moved the court to stay the order denying their motion for preliminary injunction [#49]; to reconsider its decision denying their motion for preliminary injunction and to waive their requirement to post a bond [#56].

Defendants oppose plaintiffs' motion for summary judgment and cross-move for summary judgment arguing: (1) that the BLM reasonably prepared an environmental assessment (EA) for the Tioga bridge project[2] which thoroughly assessed the ten NEPA factors and concluded that an environmental impact statement (EIS) was not required and subsequently, (2) the IBLA rationally concluded that the BLM had complied with its statutory requirements. [#52, AR 80-81]. Defendants also oppose plaintiffs' motion to stay. [#54].

## Background

### 1. Procedural history

The Tioga Bridge and Susan Creek Day-Use area project (project), involves approximately 103 acres of public land and is part of a 33.8 mile segment of the North Umpqua River which has

---

[1] The Tioga Bridge and Susan Creek Day-Use area project is located in the Roseburg BLM district in Douglas County, Oregon.

[2] On October 28, 2010, the IBLA decision affirmed the BLM's decision and Finding of No Significant Impact (FONSI). [#27-p.6-AR 68-81].

ORDER - p.2

been designated as a wild and scenic river corridor protected under the WSRA. [AR-00069]. Located approximately 30 miles east of Roseburg, the area is popular with rafters, hikers, anglers, mountain bikers, campers and other outdoor recreationalists. [AR-01286].

The North Umpqua River Management Plan (NURMP) included objectives: to "manage, maintain and enhance transportation facilities for safe access to recreational facilities and opportunities within the corridor"; to "provide diverse river and land based recreational opportunities"; to allow "safe recreational use"; to "construct new facilities to barrier free standards where practical to provide recreation opportunities for the physically challenged"; as well as to "maintain current wildlife species composition"; and to "require all developments to harmonize with the natural environment." [AR-03172-73]. In 1992, the NURMP proposed that a bridge be built over the North Umpqua in the Susan Creek area, to provide better access to the Tioga segment of the 79-mile North Umpqua Trial for rescue personnel, hikers and fishermen. [AR-01287; AR-03229-30].

In 2007, to facilitate that proposal, the BLM began the process of buying four land parcels owned by Douglas County and in 2008, purchased the land for $500,000. [AR-02153; AR-01890-95]. In 2009, the BLM gave public notification of its plans for the project. [AR-01688-99]. Over the course of the public scoping

period, the BLM accepted public comments, held an open house, conducted two field tours and made a presentation at the annual sportsmen's show at the Douglas County fairgrounds. [AR-00316].

The record contains excerpts from Mr. Bowler's May 22, 2009 letter written following his visit (with the Steamboaters), to the Tioga Bridge site on behalf of the Native Fish Society, Steamboaters and North Umpqua Foundation saying:

> "There are no objections to the building [of] the bridge as long as the piers are tested and found safe to support a new span. All agreed that the design of the bridge was appealing . . . [i]n conclusion, [while objecting to expansion of the parking lot] we all concur that the trail and bridge components of the project do emphasize and add to the recreational value of this wild and scenic [river] area."

[AR-00071, citing AR, Ex.272].

A May 29, 2009 letter to the BLM from the Steamboaters stated "[We] recognize the reasons and need for the bridge and support the plans for trail extension and bridge." AR-00071 citing AR, Ex.271]. In a July 2, 2009, telephone conversation with the BLM, Mr. Bowler reiterated that he "supported the trail and bridge and thought those were good projects but does not want to see more asphalt or parking in the area." [AR-00071, citing AR, Ex.265].

On July 21, 2009, the BLM issued its Tioga bridge project Environmental Assessment (EA) which discussed but eliminated five other alternatives to the project proposal. [AR-01268-335]. The project as initially proposed by the BLM, consisted of (1) expanding an existing parking lot day-use area on the south side of

ORDER - p.4

highway 138; (2) placing three 20-foot gazebos in the day-use area; (3) placing a 270-foot wooden pedestrian bridge at highway 138 milepost 28 atop existing cement piers[3] (which would be raised an additional two to three feet to exceed the 100-year flood level); (4) building a new 0.8 mile long, five-foot wide trail (Emerald Trail) running west from the day-use area to the bridge site; (5) building two pedestrian bridges over two creeks along Emerald Trail and (6) allowing for geotechnical drilling[4]. [AR-00069-70].

Ultimately the decision document (Decision) [AR-00426-35] issued on May 18, 2010, excluded the proposed expansion of the parking lot[5] (project item 4) and authorized only one of the three proposed gazebos (project item 2). [AR-00427-28]. On May 18, 2010, the BLM after considering ten possibly significant impacts

---

[3] The piers once supported the Youngs Bay motorized bridge which was erected in the 1950s and destroyed in a flood in 1964. [AR-00070, Fn.5].

[4] The Emerald Trail has been completed and all core drilling done to analyze the subsurface structure below the Susan Creek construction site was completed in September and October 2010. [#29-pp.3-4]. The holes were drilled at least 10 feet from the top edge of the stream bank and were refilled after the sampling was completed. Id.

[5] The Decision document states that the parking lot construction was deferred and if later considered would require the BLM to:
> "assess changes in recreational user needs and patterns based on the new recreational opportunities the Tioga Bridge and Emerald trail will provide. Any potential future expansion of the parking lot and/or improvements to the raft launch in the Susan Creek Day-Use Area will be presented to the public through a separate environmental assessment."
[AR-00427].

ORDER - p.5

made a Finding of No Significant Impact (FONSI), and decided that an environmental impact statement (EIS), was not required. [AR-00436-40]. Plaintiffs appealed the Decision to the U.S. Interior Department's Board of Land Appeals (IBLA) which on October 28, 2010, affirmed the BLM's Decision and FONSI. [AR-00068-81].

Scheduled work before October 2011, includes placing the one authorized gazebo in a grassy area within the developed Susan Creek day-use area and finishing the Emerald Trail by covering the trail with the already delivered gravel.[6] [#27-p.2; #29-pp.2-3].

BLM states it does not intend to remove any more trees until October 2011. [#27-p.1]. Tree removal of approximately 62-64 trees[7] by the BLM and Oregon Department of Transportation (ODOT), to enable installation of the Tioga bridge and realignment of Highway 138, is scheduled to begin in October 2011. [#20-p.4; #27-p.2;#28-pp.3-4]. The highway realignment is scheduled to be completed by ODOT in the summer of 2012. *Id.* The bridge placement is scheduled for the 2012 summer as well. *Id.*

---

[6] The path has been surfaced with gravel by BLM staff and the Northwest Youth Corps so that the trail conforms to accessibility standards for disabled persons. [#29-p.2].

[7] Of the approximately 60 trees to be removed, almost 40 are within the ODOT right of way. [#52-p.4; AR-00427].

ORDER - p.6

Discussion

Plaintiffs move for summary judgment arguing that defendants violated the WSRA, NEPA, FLPMA and the APA and seek an order enjoining defendants from undertaking any action on the project until and unless they comply with these laws and regulations. [#14]. Defendants cross-move for summary judgment on all five claims contending the agency actions were rational, appropriate and have complied with their statutory or APA requirements. [#37].

**1. Review under the Administrative Procedure Act:**

The Administrative Procedure Act (APA) governs judicial review of agency actions. 5 U.S.C. §706. In an APA case, summary judgment is awarded if after reviewing the administrative record, it is determined that the agency's action was arbitrary and capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole. *Morongo Band of Mission Indians v. FAA,* 161 F.3d 569, 573 (9th Cir. 1988); 5 U.S.C. §706(2)(A).

A decision is arbitrary and capricious if the agency: (1) has relied on factors which Congress has not intended it to consider; (2) entirely failed to consider an important aspect of the problem; (3) offered an explanation for its decision that runs counter to the evidence before the agency; or (4) is so implausible that it could not be ascribed to a difference in view or product of agency expertise. *Calif. State Grange v, NFMS,* 620 F.SUPP.2d 1111, 1142

(E.D. Cal. 2008); *United States v. Snoring Relief Labs, Inc.*, 210 F.3d 1081, 1085 (9th Cir. 2000). Review under this standard is narrow, and the reviewing court may not substitute its judgment for that of the agency. *Morongo Band*, 161 F.3d at 573.

**2. National Environmental Policy Act (NEPA) allegations:**

Plaintiffs assert that defendants failed to take the requisite "hard look" at: (1) the violation of the BLM Visual Resource Management Plan posed by "adding an unsightly and large bridge clearly visible from Highway 138 and to the casual visitor passing or stopping at the bridge abutments fishing pool"; (2) the possible effects of the project on the Northern Spotted Owls and Oregon Coastal Coho in the area; (3) the effect of the proposed tree removal; or (4) where or how equipment will access the west side of Susan Creek. [#15-pp.11-15]. Plaintiffs argue these factors become especially significant when viewed together with a possible future parking lot expansion which they speculate has not been abandoned but simply deferred. [#15-pp.15-17]. Defendants respond that the BLM reasonably examined each of the NEPA significance factors and rationally determined that an EIS was not required. #38-p.10].

In determining whether a project "significantly" impacts the environment, NEPA regulations require the agency to consider

ORDER - p.8

context and intensity[8]. 40 C.F.R. §1508.27. NEPA regulations include, the following factors when evaluating intensity: the degree to which the effects on the quality of the human environment are likely to be highly controversial; the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks and whether the action is related to other actions with individually insignificant but cumulatively significant impacts. 40 C.F.R. §1508.27(b)(4), (5), (7).

Federal agencies are required to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. §4332(2)(C). This does not mean that an EIS is required any time "a federal agency discloses adverse impacts on a species or habitat or acknowledges information favorable to a party that would prefer a different outcome." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005).

Review of this administrative record reveals that no scientific experts or expert state agencies criticized the project and supports defendants assertion that there is public support for the project among the Douglas County Commissioners, local business owners, hikers, and outdoor clubs. [See e.g., AR-01604-05; 01608-

---

[8] Context refers to the area of "the affected region, the affected interests and the locality." 40 C.F.R. § 1508.27(a). Intensity "refers to the severity of the impact." 40 C.F.R. § 1508.27(b).

ORDER - p.9

10; 1619; 1640]. The record does not support plaintiffs' contention that the proposed bridge is "large and unsightly" - even Mr. Bowler is on record as thinking it's design is "appealing". [#15-p.11].

Contrary to plaintiff's assertion that the BLM "attempt[ed] to downplay the number of trees that will be cut" [#47-p.2], the record indicates specific numbers proposed to be removed, most of which are in the ODOT right-of-way. [Ar-00427-28]. The record also includes projections with regard to the hazard trees projected to be cut. [AR-00428].

The record clearly states that the BLM will, before any parking lot expansion is considered, assess changes in recreational use and patterns and present plans for expansion to the public through a separate EA. [AR-718-19; 850-51]. Plaintiff's allegations that public safety would be adversely affected without increased parking are refuted by *inter alia,* Mr. Bowlers' own statements in the record, indicating he did not believe a parking lot expansion was needed because the current 32-space parking lot was under utilized[9]. [AR--1353].

The BLM considered the impact on threatened species and while the USFWS did determine that the project would "likely adversely

---

[9] Using Mr. Bowler's own numbers of approximately 5 cars in the parking lot now, even if there were to be a 100% increase in recreational use - and BLM anticipates only 25% - the result would be a 32 space parking lot with 10 cars in it.

ORDER - p.10

affect spotted owls," I note that determination was made when the project included the parking lot expansion (which was predicted to take more trees than the entire remaining project). [AR-00564-00632]. The record shows that agency biologists determined that "no measurable impacts on fish populations are predicted as a result of the proposed actions." [AR-01303].

Where as here, the record reveals that an agency based a FONSI upon relevant and substantial data, the fact that there is evidence supporting a different scientific opinion in the record does not render the agency decision arbitrary and capricious. *Wetlands Action Network v. U.S. Army Corps of Engineers,* 222 F.3d 1105, 1120-21 (9th Cir 2000). Based on the administrative record in this matter, I find the agency's decision not to prepare an EIS as detailed in its EA, reasonable.

The EA discussed a variety of alternatives as required[10], including the bridge location at the Susan Creek campground which plaintiffs prefer. Nor is there evidence in the record to support a finding that the IBLA affirmation of that decision was arbitrary and capricious. The BLM and IBLA have therefore complied with their statutory obligations under NEPA.

---

[10] See e.g., Native Ecosystems Council v. USFS, 428 F3d 1233, 1245 (9th Cir. 2005). (NEPA requires an EA to include brief discussions of the need for and the alternatives to a proposal)

ORDER - p.11

### 3. Wild and Scenic Rivers Act (WSRA):

The parties agree that the North Umpqua River is designated a wild and scenic river. Plaintiff argues that this means the site's outstandingly remarkable value, namely a focus on scenery, will be violated by the proposed "elaborate and intrusive" Tioga bridge and is therefore an arbitrary and capricious departure from the goals and values set out in the WSR plan. [#15-p.26].

Defendants note that the affected portion of the river is designated as recreational[11] and therefore the agency manages its lands around Highway 138 under a visual resources class under which "changes should repeat the basic elements of form, line, color, texture and scale found in predominant natural features of the characteristic landscape." [#38-p.28; AR-01293]. As defendants note (and the record shows), the existing concrete piers are visible from the highway. [#38-p.28; AR-01293-94]. Further defendants contend that while the bridge will be visible from the highway, it's natural color and design will not detract from the view but rather by providing new scenic vistas, enhance the scenic qualities of the area. *Id.* This contention is bolstered by plaintiff Bowler's letter and telephonic support of the bridge design. [AR-00319; 00928-29].

---

[11] Recreational river areas are those "rivers or sections of rivers that are readily accessible by road or railroad that may have some development along their shorelines . . . ." 16 U.S.C. §1273(b)(3).

I therefore find that the IBLA's ruling that the BLM had complied with the applicable visual resource requirements is reasonable. The BLM's actions were consistent with the WSRA.

### 4. Federal Land Policy and Management Act (FLPMA):

The FLPMA interacts with the Wilderness Act to provide the BLM with broad authority to manage areas with wilderness characteristics contained in federally owned land parcels. 43 U.S.C. §1782. FLPMA requires the BLM to follow the mandates they establish in their Resource Management Plans (RMP). [#15-p.28].

Plaintiff asserts that defendant have violated FLPMA by not complying with the aquatic conservation strategy of the Northwest Forest plan by cutting trees , increasing turbidity and degrading the sediment regime in the watershed. [#15-pp.28; 31]. Plaintiffs further allege that defendants did not sufficiently consider the Aquatic Conservation Strategy (ACS) and argue that the proposed action will not meet those objectives at either the site or the watershed scale. [#15-p.31]. Specifically plaintiffs are concerned that "cutting trees within riparian reserve, some on the banks of Susan Creek, running heaving [sic] equipment 200 feet along the bank of Susan Creek, and the other activities contemplated by the project, are likely to prevent attainment of ACS objectives." [#15-p.32].

Defendants respond that the BLM rationally determined that the project would not prevent attainment of the ACS. [#38-p.30;

AR-01326-30]. Defendants note that the BLM included 38 specific design features and nine ACS objectives explaining on a site-specific basis, how to avoid riparian function impacts. [AR-01281-84]. The BLM also connected its site-specific analysis to the Middle North Umpqua Watershed Analysis. [AR-01326-30; 2338-503]. The record supports defendants' contention that the project will neither reduce canopy closure in a way that would potentially influence in-stream flows nor measurably increase stream turbidity. [AR-01329; 01297-305].

Evidence that a project will result in some degradation will not, standing alone, constitute ACS noncompliance. *Bark v. U.S. Bureau of Land Management,* 643 F.Supp.2d 1214, 1235-36 (D.Or. 2009)(citing with approval *Pacific Coast Fed'n of Fishermen's Assocs v. National Marine Fisheries Serv.,* 71 F.Supp.2d 1063, 1070(W.D.Wa 1999)). In this instance, the project design features are in fact, designed to prevent potential degradation. [AR-01326-30]. Thus, while the record shows this project will result in some short-term increased flow velocities and decreased fish habitat availability, that evidence is insufficient to demonstrate ACS noncompliance or agency action that is arbitrary and capricious.

## Conclusion

For the reasons detailed above, plaintiff's Motion for Summary Judgment[#14] is DENIED. Defendants' Cross-Motion for Summary Judgment[#37] is GRANTED. Plaintiff's Motion to Stay [#49] is DENIED. Plaintiff's Motion to Renewed Motion for Preliminary Injunction and bond waiver [#56] is DENIED as moot.

IT IS SO ORDERED

DATED this _17th_ day of October, 2011.

_____
UNITED STATES DISTRICT JUDGE